

Eileen W. Hollowell, Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | Chapter 13 |
| | ) | |
| ANTHONY TARANTOLA, | ) | Case No. 4:09-bk-09703-EWH |
| | ) | |
| Debtor | ) | |
| | ) | |
| ANTHONY TARANTOLA, | ) | Case No. 4:11-ap-00088-EWH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEUTSCHE BANK NATIONAL TRUST COMPANY, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM DECISION** |

## I. INTRODUCTION

After traveling along a winding path through confusion, delay, faulty evidence, vexatious argument, and some legitimate legal disputes, this case has finally arrived at its denouement in this court. The only question remaining is whether Deutsche Bank National Trust Company ("Defendant"), acting as the trustee of a securitized mortgage pool called Asset-Backed Pass-Through Certificates Series 2004-W8 ("the Pool"), has standing to enforce a promissory note ("the Note") executed by Anthony Tarantola

(Plaintiff) and secured by a deed of trust ("the DOT") encumbering Plaintiff's home ("the Residence"). For the reasons explained below, the Court finds that it does. The Court refrains from recapitulating this case's entire history—an exercise which would transform this decision into a lengthy tome—and instead restricts its analysis to the procedural background and substantive facts pertinent to resolving the sole outstanding issue.[1]

## II. PROCEDURAL AND FACTUAL HISTORY

*A) Procedural History*

Plaintiff filed a Chapter 13 voluntary petition on May 7, 2009. In December of that year, Defendant filed a Motion for Relief from Stay ("the MRS"), alleging that Plaintiff was in default on mortgage payments for the Residence. Plaintiff responded to the MRS by challenging Defendant's standing to seek relief pursuant to § 362(d)(1),[2] arguing that Defendant could not demonstrate that it was entitled to enforce the Note as a "party in interest." The Court concurred with Plaintiff and issued a Memorandum Decision on July 28, 2010 ("the MRS Decision"). In re Tarantola, 2010 Bankr. LEXIS 2435, 2010 WL 3022038 (Bankr. D. Ariz. July 29, 2010). Among its findings, the Court concluded that Defendant failed to produce competent evidence of its standing because it did not provide critical securitization documents. Further, Defendant offered conflicting versions

---

[1] Earlier rulings addressing additional matters in this case were made on May 18, 2011 (Docket Entry 22); May 27, 2011 (Docket Entry 25); May 3, 2012 (Docket Entry 76); September 12, 2012 (Docket Entry 88); and November 1, 2012 (Docket Entry 123). Following the rulings entered on September 12, 2012 and November 1, 2012, the only issue still before this Court is Plaintiff's objection to Defendant's proof of claim.

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

2

of the Note in a series of submissions that was generously characterized as "tortured," Tarantola, 2010 WL 3022038 at *6, but was, frankly, inept and alarming.[3]

The MRS Decision found that for Defendant to have a colorable claim sufficient to be granted relief from the automatic stay, Defendant had to either own the Note or be entitled to enforce it. Tarantola, 2010 WL 3022038 at *5. Relying on In re Samuels, 415 B.R. 8 (Bankr. D. Mass. 2008), the Court explained that to show Defendant was entitled to enforce the Note, Defendant had to: (1) demonstrate that indorsements on the Note ("the Indorsements") were executed by parties with authority to act for the respective entities that owned the Note at the times the respective Indorsements were executed; (2) demonstrate that the Note was properly transferred to the Pool pursuant to the governing Pooling and Servicing Agreement ("the PSA"); or (3) demonstrate that the Note was transferred to the Pool pursuant to the governing Mortgage Loan Purchase Agreement ("the MLPA"). Tarantola, 2010 WL 3022038 at *5.

The MRS Decision also found that Defendant never provided documentary evidence that established when the servicer that filed a proof of claim ("the POC") on behalf of Defendant, American Home Mortgage Service, Inc. ("AHMSI"), entered into an agency relationship with Defendant. Id. at *1 n.2.

Subsequent to the MRS Decision, Plaintiff initiated an adversary proceeding on January 12, 2011. A Second Amended Complaint Objecting to Proof of Claim, for Statutory or Equitable Damages, Attorney Fees and Costs, and for Declaratory Relief ("the Second Amended Complaint"), filed on September 1, 2011, ultimately charted the

---

[3] The Court commented on its concern during a May 3, 2012 hearing. Hr'g Tr. 4-7, May 3, 2012.

course for this case. At a hearing on May 3, 2012, the Court granted summary judgment to Defendant on all issues save for Plaintiff's objection to the POC.[4]

The Court then focused on whether Defendant is entitled to enforce the Note, the dispositive question raised by Count One of the Second Amended Complaint.[5] Plaintiff alleged that Defendant could not do so because it could not show that the Note had been delivered to the Pool by indorsement or assignment. Absent this showing, Plaintiff asserted, Defendant would be forced to rely on the securitization documents to demonstrate delivery, and Plaintiff argued that pursuant to New York trust law, securitization documents only evidence intent to deliver, not actual delivery of trust property (such as the Note) to the Pool.

The Court took evidence at hearings held on October 15, 2012 and November 26, 2012 ("the Evidentiary Hearings"), and the parties each submitted a post-trial brief. The relevant substantive facts and arguments necessary to decide the issue of Defendant's standing have been culled from the record of the Evidentiary Hearings and the parties' manifold, and often repetitive, pleadings.

*B)   Factual History*

Plaintiff executed the Note in favor of Argent Mortgage Company, LLC ("Argent") on November 7, 2003. The Note evidences a loan in the amount of $377,600 ("the

---

[4] Summary judgment in Defendant's favor was memorialized in an Order entered on September 12, 2012 (Docket Entry 88). It would have been entered sooner, but Defendant failed to comply with the Court's instruction to upload a written order granting it partial summary judgment. In an order entered on September 1, 2012, the Court denied Plaintiff's Motion for Summary Judgment because the parties were still conducting discovery in order to address outstanding issues of material fact.

[5] Count One also alleges that AHMSI did not have standing to file the POC on behalf of Defendant. However, the parties offered relatively little evidence addressing AHMSI's relationship to Defendant in their pleadings and over the course of the Evidentiary Hearings.

4

Case 4:11-ap-00088-EWH    Doc 140    Filed 04/11/13    Entered 04/12/13 09:17:36    Desc
Main Document - Amended Complaint    Page 4 of 18

Loan") which Plaintiff used to purchase the Residence. The Note was secured by a DOT, dated November 7, 2003, which encumbers the Residence.

The Note was subsequently transferred multiple times, and the copy of the Note submitted with Defendant's POC bears two Indorsements: (1) from Argent to Ameriquest Mortgage Company ("Ameriquest Mortgage"), without recourse, signed by Wayne Lee, President, and John Grazer, EVP/CFO; and (2) a blank indorsement from Ameriquest Mortgage, without recourse, signed by Kirk Langs, President, and John Grazer, EVP/CFO.[6]

The Note was transferred into the Pool by operation of the MLPA and the PSA.[7] Dated May 4, 2004, the MLPA provided that Ameriquest Mortgage would sell a collection of mortgage notes to Argent Securities Inc. ("Argent Securities") so that Argent Securities could create the Pool and deposit the notes into it. The notes were sold for consideration as outlined in Section 3 of the MLPA. An attachment to the MLPA, called the Mortgage Loan Schedule ("the Schedule"), identified which mortgage notes were subject to the sale, and the Note is listed on the Schedule.[8] In Section 4(a) of the MLPA, Ameriquest Mortgage conveyed all of its rights in, to, and under the notes. In Section 4(b), Ameriquest Mortgage agreed to deliver the original notes indorsed in blank, without recourse, or indorsed in the following form: "Pay to the order of Deutsche

---

[6] One of Defendant's witnesses, Denise Apicella, submitted a Declaration explaining that Argent, Ameriquest Mortgage, Argent Securities, Inc., and AMC Mortgage Services, Inc. were related entities controlled by parent ACC Capital Holdings Corporation ("ACC") before the subsidiaries ceased business operations in September 2007.

[7] Copies of the MLPA and PSA were submitted as exhibits along with the Declaration of Ronaldo Reyes ("the Reyes Declaration"), another one of Defendant's witnesses.

[8] A redacted copy of the Schedule also was submitted as an exhibit along with the Reyes Declaration.

5

Bank National Trust Company, as Trustee under the applicable agreement, without recourse…."

The PSA governed administration of the Pool. Dated May 1, 2004, it listed Argent Securities as Depositor, Ameriquest Mortgage as Master Servicer, and Defendant as Trustee. Section 2.01 of the PSA, titled "Conveyance of Mortgage Loans," provided that Argent Securities would convey all of its rights in and to the notes identified by the Schedule to Defendant as trustee. It also provided that in connection with the transfer of rights, Argent Securities would deliver to Defendant the original [notes], indorsed in blank, without recourse, or indorsed in the following form: "Pay to the order of Deutsche Bank National Trust Company, as Trustee under the applicable agreement, without recourse…."

During the Evidentiary Hearings, Ronaldo Reyes, a vice president employed by Defendant, testified ("the Reyes Testimony") that he oversees administration of securitization trusts, such as the Pool, and serves as a document custodian for Defendant.[9] Reyes explained that in the ordinary course of business, he and the employees he supervises receive and review all documents intended for deposit into various securitized mortgage pools, including mortgage notes.[10] In his capacity as a custodian of records, Reyes's testimony verified:

a) the authenticity and contents of the PSA and MLPA;

b) the authenticity of the Schedule received from Ameriquest Mortgage;

---

[9] Hr'g Tr. 16-17, Oct. 15, 2012.

[10] Id. at 15-18.

6

c) the authenticity of the Note and the ordinary-course records reflecting Defendant's timely receipt of it along with related original mortgage documents ("the Original File");

d) his familiarity with John Glazer signing securitization documents on behalf of Argent Securities and Ameriquest Mortgage;

e) his familiarity with Wayne Lee and Kirk Langs signing securitization documents in the capacities in which they are respectively listed by the Indorsements;

f) that the Note was listed on the Schedule and included in the Pool;

g) that Argent transmitted the Original File to Defendant on November 14, 2003;

h) that the Original File was reviewed by Defendant on November 18, 2003, and that the intake review showed that the Note arrived bearing the Indorsements;

i) that the Original File, like all original documents, is maintained in a secure facility under twenty-four-hour video surveillance and protected by card-key access;

j) that while the PSA may require a note to bear an indorsement in blank, the originator need not be the party indorsing in blank;

k) that the PSA allowed for Defendant to be represented by a servicer.[11]

Following the close of evidence, Defendant argued in its post-trial brief ("the Defendant's Brief") that it had satisfied each standing test cited by the Court in the MRS Decision.[12]

Plaintiff argued more broadly in his post-trial brief ("Plaintiff's Brief"), asserting that the "credible evidence presented…establishe[d] that no money" is owed to

---

[11] Id. at 21-24; 26-27; 31; 33-34; 27; 42; 45; 47-54; 57-58; Hr'g Tr. 25-27, Nov. 26, 2012.

[12] Among the evidence it believes most important, Defendant points to Ms. Apicella's Declaration and the testimony from another ACC employee who has reviewed various corporate records, Steve Newcomb. As the docket reflects, both emerged as witnesses only as the case wore on while Defendant struggled to produce competent evidence to support its arguments. These witnesses were either unpersuasive or irrelevant. The Court would normally be concerned that Defendant was afforded so many proverbial bites at the apple, but Plaintiff and his counsel were afforded equal deference while presenting multiple theories which precluded Defendant from collecting on the Note.

7

Case 4:11-ap-00088-EWH    Doc 140    Filed 04/11/13    Entered 04/12/13 09:17:36    Desc
Main Document - Amended Complaint    Page 7 of 18

Defendant; that the sale envisioned by the MLPA and PSA "could not have occurred"; that promissory notes related to mortgage loans are not negotiable instruments subject to Article 3 of the Uniform Commercial Code ("UCC");[13] that Article 9 of the UCC is the governing law in this case, and that Defendant failed to purchase the Note for value; that the Note was not transferred into the Pool by the Closing Date listed in the MLPA or PSA; that the Indorsements fail; that the Note was not transferred into the Pool along the mandatory chain of custody; and that Defendant violated New York trust law when the Note was not timely deposited into the Pool in accordance with the conveyance provisions of the MLPA and PSA.

## III. ISSUES

1) Is Defendant entitled to enforce the Note under any legal theory?

2) Does AHMSI have standing to file a POC on behalf of Defendant?

## IV. JURISDICTIONAL STATEMENT

Jurisdiction is proper for the matters decided under 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), and (K).

## V. DISCUSSION

Time and again, in this case and in others, the Court has contorted itself in order to balance the due process to which clients represented by Plaintiff's counsel are entitled and the need to protect opposing parties from counsel's sprawling and often counterproductive litigation ambitions. True to form, Plaintiff's Brief was replete with a closing battery of arguments that have little relationship to Plaintiff's pleadings, discovery, and evidence.

---

[13] Arizona has adopted the UCC at ARS §§ 47-1101 through 47-4A507.

8

Case 4:11-ap-00088-EWH    Doc 140    Filed 04/11/13    Entered 04/12/13 09:17:36    Desc
Main Document - Amended Complaint    Page 8 of 18

The Court believes that the ensuing analysis addresses those questions which merit consideration and ignores others which are beyond the substantive boundaries which the Court established. As articulated almost a year ago, the Court granted Defendant summary judgment on all matters save for Count One of the Second Amended Complaint, a claim objection.[14] The Court allowed the parties to conduct supplemental discovery in May, June, and July of 2012 concerning "the authority of the [i]ndorsers of the [N]ote" and the signature page of the MLPA.[15] At a September status hearing in advance of the Evidentiary Hearings, the Court reiterated that "the only remaining [issue]" was Plaintiff's objection to the POC.[16] The scope of the Evidentiary Hearings was "limited to the validity of the [I]ndorsements and to the delivery of the [N]ote."[17]

*A) Standing in a Mortgage Case*

Standing is "a threshold question" required in every federal case that determines whether the court may entertain the proceeding. Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal), 450 B.R. 897, 906 (9th Cir. BAP 2011) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)) (internal quotation marks omitted). A creditor seeking to exercise some interest in a debtor's estate must demonstrate both constitutional and prudential standing. Veal, 450 B.R. at 906-7.

---

[14] Hr'g Tr. 31-36, May 3, 2012; Hr'g Tr. 28, June 6, 2012. At the June 6 hearing, the Court acknowledged that the POC objection encompassed a challenge to the extent and validity of Defendant's lien on the Residence. The Court need not engage in a detailed review of this issue because determining whether Defendant is entitled to enforce the Note resolves the lien question. In Arizona, a security instrument, like the DOT, follows a promissory note. See ARS § 33-817; Hogan v. Wash. Mut. Bank, 277 P.3d 781, 784 (Ariz. 2012); Vasquez v. Saxon Mortgage, Inc., 228 Ariz. 357, 266 P.3d 1053 (Ariz. 2011);

[15] Hr'g Tr. 15-16, June 6, 2012.

[16] Hr'g Tr. 3, Sept. 12, 2012.

[17] Id. at 5.

9

To establish constitutional standing, a creditor must clear the relatively low hurdle of demonstrating injury in fact, causation, and redressability. Veal, 450 B.R. at 906. A note holder seeking to enforce its rights satisfies these elements because bankruptcy's automatic stay prohibits pursuit of available remedies (injury), enjoins pursuit of relief outside of bankruptcy (causation), and offers potential relief—such as lifting the stay—which would remedy the injury (redressability). Id.

A party enforcing a note also must demonstrate that it has prudential standing, and this means that the creditor must show that it is a "real party in interest" pursuant to Civil Rule 17(a). Veal, 450 B.R. at 907. In mortgage cases involving a negotiable instrument secured by real property, the substantive law is generally supplied by the UCC, as adopted or implemented by state law. See id. at 908-10 (discussing Article 3 and Article 9 of the UCC). "Under this construct, a party may establish its standing by showing it is the 'person entitled to enforce' the promissory note as that phrase is defined by UCC Article 3." Tovar v. Heritage Pac. Fin., LLC (In re Tovar), 2012 Bankr. LEXIS 3633 at *14-15, 2012 WL 3205252 (9th Cir. BAP Aug. 3, 2012) (citing Veal, 450 B.R. at 908-10).

*B) "Holder" Status under Article 3*

As recently explained by this Court in Connelly v. U.S. Bank Nat'l Assoc. (In re Connelly), 487 B.R. 230, 240-41 (Bankr. D. Ariz. 2013), in Arizona, the party seeking to enforce payment under a promissory note must establish that it is a "person entitled to enforce" an instrument. Ariz. Rev. Stat. ("ARS") § 47-3301. And though this seems axiomatic, the party obligated on the note must pay a "person entitled to enforce." Veal, 450 B.R. at 910. There are several ways to acquire the status of a "person entitled to

10

enforce," and the most pertinent to this case are (1) to become a "holder" of the note or (2) to become a "nonholder in possession of the instrument who has the rights of a holder." ARS § 47-3301.

A party is a holder of a note if that party possesses the note and either: (i) the note has been made payable specifically to the order of the party in possession; or (ii) the note is payable to the bearer. Veal, 450 B.R. at 911; ARS § 47-1201(B)(21)(a). When indorsed in blank, an instrument becomes payable to the bearer and may be negotiated by transfer of possession alone. ARS § 47-3205(B). "Bearer" means a person in possession of a negotiable instrument that is indorsed in blank. ARS § 47-1201(B)(5).

Construing these statutes together, the Court finds that Defendant is a holder of the Note entitled to enforce it because Defendant is the bearer of the Note properly indorsed in blank. ARS § 47-3308(A) affords a presumption of authenticity to signatures on negotiable instruments, but it also provides that when the validity of an indorsement is challenged, the burden of demonstrating authenticity falls on the party asserting it. Given the reasonable suspicion about Defendant's records aroused during the MRS proceeding, Defendant had to satisfy this burden. It did so through the Reyes Testimony. Relying on personal knowledge, Reyes persuasively set out that Defendant received the Note in November 2003 bearing the Indorsements, one in blank, and Reyes, a custodian, verified that the Indorsements were from parties with the power to negotiate instruments on behalf of their respective organizations. Plaintiff did not impeach the Reyes Testimony or offer sufficient countervailing evidence to support a finding that the Indorsements were invalid.

11

Furthermore, Fed. R. Evid. 902(11) permits self-authentication of documents as business records under Fed. R. Evid. 803(6) if the documents are accompanied by a written declaration of its custodian or other qualified person, certifying that the documents meet the requirements of Fed. R. Evid. 803(6). Not only did Reyes submit a declaration in this case, but he also testified about his personal knowledge of the ordinary-course business records generated when Defendant serves as trustee for securitized mortgage pools. The Court finds his testimony credible and compelling.

*C) "Nonholder" Status under Article 3*

Were Defendant not a holder, it would still have standing to enforce the Note as a nonholder in possession of the instrument who has the rights of a holder ("nonholder"). Article 3 bestows this status upon a party that takes physical delivery of an instrument through a "transfer" rather than a "negotiation." A.R.S. § 47-3203. "Transfer" is a term defined by Article 3 as the delivery "by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." A.R.S. § 47-3203(A). To establish standing as a nonholder, a party must prove (1) that it took delivery and (2) that the purpose of the delivery was to bestow the right to enforce the instrument upon recipient. Veal, 450 B.R. at 912.

The term "delivery" as used in ARS § 47-3203 is defined by Article 1 as the "voluntary transfer of possession." A.R.S. § 47-1201(15) (definition adopted by Article 3 via ARS § 47-3103(D)). Nowhere in the UCC is the term "possession" defined, but BLACK'S LAW DICTIONARY defines "possession" as "[t]he fact of having or holding property in one's power; the exercise of dominion over property." BLACK'S LAW DICTIONARY 1281 (9th ed. 2009). Thus, for an Article 3 transfer to have occurred, the transferee must be

12

in physical possession of the note after the transfer, irrespective of whether the note is actually indorsed to the transferee.

Even if the Indorsements were insufficient to render Defendant a holder, Defendant meets all of the nonholder criteria: As reflected by the Original File, governed by the MLPA and PSA, and verified by the Reyes Testimony, Defendant took possession of the Note from a party other than its issuer for the purpose of enforcing the rights which inhere to the instrument. That is the express purpose of a trustee with custodial authority over a pool of mortgage loans.

Because an Article 3 transferee's right to enforce the instrument is derived from the transferor's right to enforce, "these rights must be proved." UCC § 3-203, official cmt. 2. This can be done by showing that the transferor had enforcement rights. Id. In the present case, Defendant received the Note from Argent Securities, pursuant to the MLPA and PSA transfer provisions. Argent Securities received the Note from Ameriquest Mortgage, and Ameriquest Mortgage received it from Argent pursuant to a substantiated indorsement chain.

*C) Alternatives and <u>Samuels</u>*

The Court's nonholder analysis dovetails with the reasoning in the MRS Decision. When the Court previously relied on <u>In re Samuels</u>, it did so because the facts of that case are similar to those in this case, and the Court was attempting to analyze how the Note could be transferred into the Pool irrespective of the validity of the Indorsements. There, like here, Defendant sought to enforce a promissory note as trustee of a securitized mortgage pool into which a loan originated by Argent had been transferred. <u>Samuels</u>, 415 B.R. at 10-11. The <u>Samuels</u> court held that a "PSA itself, in

13

conjunction with [a mortgage schedule] deposited through it into the pool trust, serve[s] as a written assignment of the designated mortgage loans, including the mortgages themselves." Id. at 18. That is to say, proof of compliance with a PSA introduced alongside a corresponding mortgage schedule establishes that a note was transferred into a mortgage pool for the purpose of trustee enforcement.

The PSA required Argent Securities to convey all of its rights in and to the mortgage notes identified by the Schedule to Defendant as Trustee. It also provided that Argent Securities would deliver to Defendant the original [notes] indorsed in blank, without recourse, or indorsed to Defendant as trustee, without recourse. The Reyes Testimony demonstrated that the Note was conveyed by Argent Securities as required by the PSA, and that it was transferred by November 18, 2003, well before the PSA's Closing Date. As a result, the Court finds that Defendant has standing to enforce all rights under the Note because the Note was conveyed into the Pool through proper compliance with the PSA. The MLPA contained a complementary transfer provision, incorporated the Schedule, and required identical indorsement language. Accordingly, Defendant has satisfied those conditions, as well.

Plaintiff did not produce any evidence that controverted the Reyes Testimony concerning the PSA, the MLPA, the Schedule, or the date of delivery to Defendant. As a result, all of Plaintiff's arguments concerning New York trust law fail, because Defendant has not run afoul of the governing securities documents. For the same reason, the many trust-law cases that Plaintiff cites in Plaintiff's Brief are inapposite.

14

*D) Applicability of Article 9*

As he did in Connelly, Plaintiff's attorney argues that Article 3 is irrelevant to the determination of whether a Note has been properly transferred. In Plaintiff's view, the Indorsements, even if valid, are immaterial because the Note is not a negotiable instrument. Instead, any transfer of the Note is governed by the terms of a "security agreement," which Plaintiff alleges is the PSA. Not a single case is cited to support this proposition. Though Plaintiff appears to locate in Veal support for his arguments, he does so by citing a series of excerpts taken out of context while ignoring the actual holding—that Article 3 applies to the transfer of mortgage notes. See Connelly, 487 B.R. at 242. Plaintiff's argument that Article 9 provides the governing law of this case is not meritorious, and the Court reiterates that the only issue relevant to Plaintiff regarding the transfer of the Note is whether he faces multiple claimants competing for the right to be paid. Veal, 450 B.R. at 912 ("[a debtor] should not care who actually owns the Note—and it is thus irrelevant whether the Note has been fractionalized or securitized—so long as [a debtor…knows] who [he] should pay.")[18]

*E) AHMSI's Standing to File a POC*

Defendant has established its standing to enforce the Note under a number of legal regimes. The remaining issue is whether AHMSI, acting as Defendant's servicer, had standing to file the POC on Defendant's behalf.

Rule 3001(f) provides that if a creditor or its authorized agent executes and files a proof of claim, the proof of claim "shall constitute prima facie evidence of" its validity and amount. However, when a debtor challenges a claimant's standing, that claimant

---

[18] See also Veal, 450 B.R. at 920 (in claim-objection context, analysis follows a note, not a mortgage).

15

must present evidence to support its standing to proceed with the proof of claim. Veal, 450 B.R. at 919. Put another way, a servicer, such as AHMSI, must show that it has an agency relationship with a "person entitled to enforce" the mortgage note that serves as the basis for a proof of claim. If the servicer fails to do so, then the servicer has failed to establish standing. Id. at 920.

Establishing standing in the claims-objection context is critical for two reasons. First, "standing is a prerequisite to the evidentiary benefits set forth in Rule 3001(f)." Id. at 922. Second, the claim allowance procedure yields a final adjudication. Section 502(b)(1) directs a bankruptcy court to disallow a claim if it can be defeated by some legitimate non-bankruptcy legal defense. Inability to qualify as a "person entitled to enforce" a promissory note under the UCC would be one such defense. This is a notable distinction between claims objections and motions for relief from the automatic stay. In the event that a motion for relief from the automatic stay is granted, there will be a subsequent determination of the parties' relative rights and responsibilities in another forum, such as state court. Id. at 919. Without a forum for subsequent determination, it is incumbent upon a bankruptcy court to ensure that a real party in interest has appeared.

After combing through the various pleadings Defendant filed in this case, the Court could not find any proof that established AHMSI's agency relationship with Defendant, nor, accordingly, its standing to file the POC. During cross examination, the Reyes Testimony briefly addressed a PSA provision that authorized Defendant to retain a servicer, but that was a fleeting discussion bereft of determinative information. Beyond identifying that AHMSI had once been the servicer and acknowledging that AHMSI is

16

now known as Homeward, the Reyes Testimony did little else to establish AHMSI as a party with standing. Further, Reyes testified that the servicer acts independently of a pool's custodian of records, leaving Reyes without personal knowledge to authoritatively comment on the servicer for the Pool.[19]

The Court fills this void in the record with additional guidance from Veal, where the court found that inability to establish the agency relationship between a party entitled to enforce a note and its servicer is fatal to a proof of claim. Id. at 920; see also Kadar v. Lehman Bros. Bank (In re Kadar), 2012 WL 5390059 at *6 (Bankr. D. Ariz. Nov. 5, 2012). Accordingly, AHMSI did not have standing to file the POC. But AHMSI's failure to demonstrate an agency relationship with Defendant does not change the fact central to this litigation—Defendant has standing to enforce the Note, including the right to foreclose on the DOT. Defendant may file an amended POC for itself if it would like.

The practical question at this point in such a long and vexing case, though, is whether an amended POC would make any difference. The most recent plan filed by Plaintiff does not treat Defendant's claim. Whether the plan is confirmed or the case is dismissed, Defendant will not receive a distribution. However, the DOT will "ride through," continuing to encumber the Residence,[20] and the Residence will re-vest in Plaintiff, terminating the automatic stay. At that point, Defendant, as a party entitled to enforce the Note, will be free to exercise its contractual and state-law remedies. In essence, it makes no difference if the POC is allowed because Plaintiff's plan

---

[19] Hr'g Tr. 25-27, Nov. 26, 2012

[20] See Dewsnup v. Timm, 502 U.S. 410, 418, 112 S. Ct. 773, 116 L. Ed. 2d 903 (1992) ("It is well settled that valid, perfected liens and other security interests pass through bankruptcy unaffected").

17

1 distributions will have no effect on what Defendant receives from the bankruptcy estate,
2 and Defendant's rights will survive intact.

## VI. CONCLUSION

For the reasons explained in this Memorandum Decision, the Court finds that Defendant is a holder of the Note, and that Defendant is entitled to enforce the Note pursuant to the terms of the PSA and MLPA. However, the Court also finds that neither Defendant nor AHMSI adduced evidence sufficient to establish that AHMSI has standing to file the POC. Should it decide to do so, Defendant may file an amended proof of claim in its own name within 14 days of this ruling.

This judgment will be given effect by a separate order entered on this date.

Dated and signed above.

Notice to be sent through
the Bankruptcy Noticing Center
to the following:

Anthony Tarantola
11201 E. Hashknife Circle
Tucson, AZ 85749

Ronald Ryan
Ronald Ryan, PC
1413 E. Hedrick Dr.
Tucson, AZ 85719

Kyle Hirsch
Bryan Cave, LLP
2 N. Central Ave., Ste. 2200
Phoenix, AZ 85004

Office of the U.S. Trustee
230 N. First Ave.
Phoenix, AZ 85003

18

Case 4:11-ap-00088-EWH   Doc 140   Filed 04/11/13   Entered 04/12/13 09:17:36   Desc
Main Document - Amended Complaint    Page 18 of 18